620

# Old Guard Mutual Insurance Company v. Quigley

*Peter J. Speaker*, for plaintiff.

*Douglas P. France*, for defendants Noreen Quigley and Charles Staub.

KUHN, *J.*, January 31, 1990 —

## FINDINGS OF FACT

(1) Plaintiff is Old Guard Insurance Company.

(2) Defendants are Noreen Quigley and Charles Staub, who live at R.D. no. 1, East Berlin, Pennsylvania, and Lisa Hill, individually and as natural guardian of Summer Hill, who resides at P.O. Box 342, East Berlin, Pa.

(3) In an action docketed at 88-S-95, Hill filed suit against Quigley and Staub for injuries received by Summer Hill on June 8, 1987 when bitten by a wolf-hybrid dog owned by Quigley and Staub.

(4) At the time of the aforesaid incident Quigley was insured under a policy issued by plaintiff which specifically excludes coverage for personal liability for bodily injury "arising out of business pursuits by any insured" except "activities which are ordinarily incident to non-business pursuits."

(5) Plaintiff has refused to defend the action at 88-S-95 by asserting that Hill's injuries arose out of Quigley's business pursuits of breeding and selling wolf-hybrids.

(6) The dog involved in the incident was Teddy Bear, a/k/a Wolfen's Nakisha, who is 31/32 wolf.

(7) Quigley has owned wolf-hybrids since acquiring Wolfen's Jack in 1979.

(8) Quigley has been a member of the United States Wolf Hybrid Association and a registered breeder since 1981.

(9) Quigley became vice-president of USWHA after June 1987.

(10) At the time of the incident Quigley had a Pennsylvania Wildlife Dealer Permit for the purpose of maintaining wolf-hybrids.

(11) At the time of the incident Quigley owned four to five wolf-hybrids and maintained four separate kennels.

(12) Before and after the incident Quigley would show, breed and sell, retain or give away the offspring of her wolf-hybrids.

(13) Quigley advertised each of her wolf-hybrid litters in local newspapers and the USWHA newsletter although she would never run continuous advertisements for the sale of puppies.

(14) From 1983 to June 1987, Quigley bred four litters with from four to six puppies each and subsequent to the incident she bred three litters which produced a total of nine puppies, of which four were sold, four were given away and one was kept.

(15) Quigley generated from $150 to $350 for the sale of puppies despite a market price as high as $2,000 to $3,000 in certain parts of the country.

(16) Pursuant to order of court dated August 8, 1989, it is inferred that Quigley's and Staub's in-

come tax records and records of the USWHA prior to the incident would show that they were engaged in a business pursuit of raising, breeding, buying and selling wolf-hybrids.

(17) Quigley's primary full-time employment for the past eight years has been with the Pennsylvania Department of Agriculture as a poultry and egg inspector and in 1987 she earned $24,620 in that capacity.

(18) Quigley's 1987 income tax return lists no income or expenses related to breeding, raising and selling wolf-hybrids.

(19) Quigley's kennels are known as Wolfen Kennels, however, there is no sign identifying the premises, no kennel stationery, ledger books, checking accounts, charge accounts, separate tax number, employees or registered fictitious name.

(20) Quigley has never sold supplies or literature regarding wolf-hybrids nor boarded dogs for others.

(21) Annually, Quigley's expenses exceed her income on sales of dogs.

(22) Staub has been living with Quigley and involved with breeding and showing wolf-hybrids since the fall of 1985.

(23) Staub's primary full-time employment was at New Oxford Container at the time of the incident.

(24) Quigley and Staub continue to own, breed, raise, show and sell wolf-hybrids.

(25) Quigley's primary purpose in breeding wolf-hybrids is to produce a better show dog for herself.

## CONCLUSIONS OF LAW

(1) This court has jurisdiction.

(2) Quigley and Staub did not engage in a business pursuit on June 8, 1987 which would exclude them from coverage under plaintiff's policy.

(3) Quigley and Staub are entitled to plaintiff's insurance coverage.

## DISCUSSION

For purposes of this declaratory action, it is agreed that but for the "business pursuit" exclusion, plaintiff owes a duty to defend under its policy. The burden of proving the exclusion is upon the insurer. *Rothstein v. Aetna Insurance Company*, 216 Pa. Super. 418, 423, 268 A.2d 233, 235 (1970).

Plaintiff has been hampered in its discovery efforts to secure income tax and business records for Quigley and Staub and USWHA records regarding ownership of registered wolf-hybrids in their name. Therefore, sanctions were imposed by the order of August 8, 1989 providing that those records contained information from which an inference could be drawn that Quigley and Staub were engaged in a business pursuit of raising, breeding, buying and selling wolf-hybrids. An inference, of course, is not binding and may fade away when weighed against other contrary evidence.

Plaintiff was also able to establish that Quigley was paid money for selling several puppies from 1983 to the date of the incident and that she advertised those animals in various newspapers and magazines. However, in light of all the contrary evidence suggesting that Quigley and Staub were not engaged in a business pursuit, we find that plaintiff has failed to sustain its burden.

Quigley's homeowners insurance policy coverage specifically does not apply to bodily injury:

"(b) arising out of business pursuits of any insured . . . "

However, the exclusion does not apply to:

"(1) activities which are ordinarily incident to non-business pursuits."

The "business pursuits" exclusion has become a standard feature of homeowner's insurance policies. The wording set forth above is typical. *Camden Fire Insurance Association v. Johnson,* 294 S.E.2d 116, 117 (W. Va. 1982). Based upon our research the only Pennsylvania case to interpret a "business pursuits" exclusion is *Bullock v. Pariser,* 311 Pa. Super. 487, 457 A.2d 1287 (1983). However, that court was able to decide the case without discussing the meaning of the phrase "business pursuits."

Nevertheless, the "business pursuits" exclusion has been the subject of a significant number of cases nationwide. See 48 ALR 3d 1096 (1973). From this body of law we have ascertained that the majority view is that the term "business pursuits" contemplates two elements — continuity and a profit motive. *Allied Mutual Casualty Co. v. Askerud,* 94 N.W.2d 534 (Minn. 1959); *Home Insurance Co. v. Aurigemma,* 45 Misc. 2d 875, 257 N.Y.S.2d 980 (1965); *Crane v. State Farm Fire & Casualty Co.,* 14 Cal.App.3d 727 (1971); *American Family Mutual Insurance Co. v. Bentley,* 352 N.E.2d 860 (Ind. App. 1976); *O'Connor v. Safeco Insurance Co. of North America,* 352 S.E.2d 1244 (Fla. App. 1977); *Beitler v. Employers Insurance of Wausau,* 271 N.W.2d 603 (Wis. 1978); *State Farm Fire & Casualty Co. v. Moore,* 430 N.E.2d 641 (Ill. App. 1981); *Krings v. Safeco Ins. Co. of America,* 628 P.2d 1071 (Kan. 1981); *Camden Fire Insurance Assoc. v. Johnson, supra; Industrial Indemnity Co. v. Goettl,* 674 P.2d 869 (Ariz. App. 1983); *Frankenmuth Mutual Ins. Co. v. Kompus,* 354 N.W.2d 303 (Mich. App. 1984); *Heggen v. Mountain West Farm Bureau Mutual Ins. Co.,* 715 P.2d 1060 (Mont. 1986); *Haley v. Allstate Ins. Co.,* 529 A.2d 394 (N.H.

1987); *Moncivais v. Farm Bureau Mutual Ins. Co.,* 430 N.W.2d 438 (Iowa 1988); *Black v. Fireman's Fund American Ins.,* 767 P.2d 824 (Idaho App. 1989). We adopt the majority view.

Words of an insurance policy which are unambiguously written should be construed according to their plain and ordinary meaning and be given effect. However, if the language is ambiguous, obscure, uncertain or susceptible of more than one construction, it will be interpreted most favorably to the insured and against the insurer. *Musisko v. Equitable Life Assur. Society,* 344 Pa. Super. 101, 496 A.2d 28 (1985); *Techalloy Co. v. Reliance Ins. Co.,* 338 Pa. Super. 1, 487 A.2d 820 (1984). This policy defines "business" to include a "trade, profession or occupation." Common dictionary definitions of these terms contemplate the continuity and profit-motive elements adopted by the majority view.

As to the continuity element, there must be a customary engagement or a stated occupation. As to the profit-motive element, one must show the activity as a means of livelihood, gainful employment, means of earning a living procuring subsistence or profit, or commercial transaction. *Camden Fire Insurance Assoc. v. Johnson, supra,* 294 S.E.2d at 118. This definition is not limited to the insured's principal business, trade, profession or occupation. *Industrial Indemnity Co. v. Goettl, supra,* 674 P.2d at 873. It can include both full and part-time activity. *Reinsurance Assoc. of Minnesota v. Patch,* 383 N.W.2d 708, 712 (Minn. 1986). The issue is profit motive, not actual profit. *Saha v. Aetna Casualty & Surety Co.,* 427 So.2d 316 318 (Fla. App. 1983); *Wiley v. Travelers Insurance Co.,* 534 P.2d 1293 (Okla. 1974). Compensation alone is not determinative of a profit motive. *Camden Fire Insurance Assoc. v. Johnson, supra,* 294 S.E.2d at 120.

Of course, whether a particular activity comes within the definition of "business pursuits" must be decided on a case-by-case basis. Plaintiff contends that we should be guided by the case of *Wiley v. Travelers Insurance Co., Id.* There Wiley went to Geibe's home in response to a classified ad to purchase a St. Bernard puppy. Geibe held a full-time job as a salesman, however, he also raised St. Bernard puppies at his home. He renovated a barn as a kennel and fenced his yard. He sold puppies for $75-$300 each and also gave some away. He ran classified ads and erected a large sign in his yard. He intended to retire raising puppies. Based on these facts the Oklahoma Supreme Court concluded that Geibe was engaged in a business pursuit. At first glance this case seems to resolve the case sub judice. However, we believe the instant case has subtle distinctions.

Other significant factors to consider include the insured's treatment of his income and expenses for income tax purposes, *Heggen v. Mountain West Farm Bureau Mutual Ins. Co., supra,* and maintenance of a trade name, stationery, business cards, business checkbook, and business record book. *Reinsurance Assoc. of Minnesota v. Patch, supra.*

In the case sub judice continuity is established by the record. Factors suggesting a profit motive include: (1) some dogs were sold for $150 to $300 each; (2) litters were advertised in local newspapers and USWHA newsletters; (3) an inference was imposed by sanction that tax records would show that Quigley engaged in a business of raising, breeding and selling wolf-hybrids; (4) the kennel line is known as Wolfen Kennels. Factors mitigating against a profit motive include (1) advertising space in USWHA newsletters is free to members; (2) over four years prior to the incident Quigley only bred

four litters; (3) many puppies were either given away or were sold far below available market price; (4) both Quigley and Staub had full-time employment; (5) the 1987 tax records prepared before suit was filed listed no income or expenses relating to the dogs; (6) Quigley maintained no business sign, stationery, ledger books, checking accounts, charge accounts, employees or registered fictitious name; (7) Quigley's stated purpose for breeding was to develop a good show dog and in selling or giving away puppies she was most concerned about securing a good home for them; and (8) the price of food alone substantially exceeded any income Quigley would have generated from the sale of puppies.[*]

Although this case is extremely close we conclude that there are sufficient differences to distinguish this case from *Wiley, supra*. Therefore, we find that Quigley and Staub were not engaged in a business pursuit.

Furthermore, even if we were to find the activity to be a business pursuit, we would be inclined to hold that the activity was one which was ordinarily incident to non-business pursuits and therefore covered. The dog in question, Teddy Bear, a/k/a Wolfen's Nakisha, was born on May 1, 1984. At the time of the incident the dog was leashed on the front yard of the Quigley-Staub residence. The four-year-old victim ran through the area where the

---

[*] Plaintiff suggested that Quigley's wildlife permit issued by the Game Commission is also significant. We find this factor to be neutral on the basis of the record presented. Pursuant to 34 Pa.C.S. §2962, adopted and made effective after the date of the incident, the Game Commission may issue a permit to a person to act as an exotic wildlife dealer for possessing, buying, selling, donating, giving away or otherwise disposing of exotic wildlife. The phrase *exotic wildlife* includes wolves, 34 Pa.C.S. §2961. Thus, even one possessing or giving away a wolf must have a permit or suffer imposition of a penalty for summary offense of first degree.

dog was leashed and was bitten. Thus, the injury was in no manner related to the business of breeding or selling dogs, as in *Wiley, supra,* but was one which is ordinarily incident to the non-business pursuit of owning the family pet.

Accordingly, we enter the attached

## ORDER OF COURT

And now, January 31, 1990, the court finds that declaratory judgment be entered against plaintiff.